# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : |  |
| SELECTBUILD ILLINOIS, LLC, *et al.*,[1] | : |  |
|  | : | Case No. 09-12085 (KJC) |
| Reorganized Debtors | : |  |
|  |  | (Re: D.I. 19) |

## MEMORANDUM DENYING DEBTORS' MOTION TO ENFORCE THE PERMANENT INJUNCTION[2]

**BY:    KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the Reorganized Debtors' Motion to Enforce the Permanent Injunction against The Ryland Group, Inc. (the "Motion") (D.I. 19). This matter stems from a dispute over efforts by The Ryland Group, Inc. d/b/a Ryland Homes ("Ryland") to obtain indemnification from ACE American Insurance Company ("ACE") for personal injury claims brought by former employees of debtor SelectBuild Illinois, LLC ("SelectBuild") against Ryland in Illinois state court. The Reorganized Debtors argue that Ryland's efforts would violate the discharge injunction provided by their confirmed plan because it could trigger SelectBuild's obligation to pay a $1.9 million deductible under its policy with ACE. Ryland contends that it should be allowed to seek indemnification from ACE because, for among other reasons, Ryland

---

[1] The Reorganized Debtors are as follows: Building Materials Holding Corp., BMC West Corp., SelectBuild Construction, Inc., SelectBuild Northern California, Inc., Illinois Framing, Inc., C Construction Inc., TWF Construction, Inc., H.N.R. Framing Systems, Inc., SelectBuild Southern California, Inc., SelectBuild Nevada, Inc., SelectBuild Arizona, LLC, and SelectBuild Illinois, LLC.

[2] This Memorandum constitutes the findings of fact and conclusions of law, as required by Fed.R.Bankr.P. 7052. This Court has jurisdiction to decide the Motion pursuant to 28 U.S.C. §157 and §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B) and (O).

is an additional insured on the policy. For the reasons set forth below, the relief requested by the Reorganized Debtors will be denied, and Ryland will not be enjoined from seeking indemnification as an additional insured from ACE.

BACKGROUND[3]

*The Construction Contract*

In January 2005, Ryland and SelectBuild (then known as RCI Construction, LLC) entered into a construction contract (the "Contract")[4] under which SelectBuild agreed to perform work as a subcontractor for Ryland. The Contract provided that SelectBuild would indemnify Ryland in certain circumstances:

> To the maximum extent permitted by law, Subcontractor [SelectBuild] shall indemnify, hold harmless and defend Ryland . . . from any and all claims, costs, losses, damages, fines, penalties, fees and other costs, including, but not limited to, attorneys' fees and dispute related costs (collectively, "Such Costs"), to the extent that Such Costs arise out of, are incidental to or result from (a) the performance of the Work . . . and are attributable to bodily injury, personal injury, sickness, disease or death of any person, including any injury or death of an employee or owner of Subcontractor . . . or (b) Subcontractor's or Subcontractor's Agents failure to comply with the Legal Requirements and (a) or (b) is caused by any act or omission of Subcontractor or anyone acting for, on behalf of or through or representing Subcontractor or Subcontractor's Agents.[5]

The Contract required SelectBuild to maintain minimum insurance as detailed in Addendum #4.[6]

Addendum #4, in turn, required that SelectBuild purchase commercial general liability insurance

---

[3] The facts of this matter are not disputed and, for the most part, are taken from the Statement of Uncontested Facts contained in the parties' Joint Pretrial Memorandum Concerning Reorganized Debtors' Motion for an Order Enforcing the Permanent Injunction against The Ryland Group, Inc. (D.I. 28) (the "Joint Pretrial Memorandum" or "JPM").

[4] "January 31, 2005 Subcontractor Agreement," Debtors' Ex. 1.

[5] Contract ¶ 6 (original in all capitals).

[6] Contract ¶ 5(a).

and issue a certificate of insurance naming Ryland as an additional insured for all jobs performed for Ryland.[7]

*The Insurance Policy*

SelectBuild maintained the requisite insurance by virtue of a policy with ACE (the "ACE Policy") covering the relevant period of November 11, 2007, through November 11, 2008.[8] On November 8, 2007, SelectBuild issued a certificate of insurance to Ryland, referencing the ACE Policy.[9] The basic insuring agreement under the ACE Policy provides that the policy will pay an insured for covered losses in excess of the retained limit.[10] Endorsement No. 61 to the ACE Policy provides that the "Retained Limit" is $100,000 and the "Deductible Per Occurrence" is $1,900,000.[11] An "occurrence" is "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[12]

Endorsement No. 8 to the ACE Policy provides that a contractor, such as Ryland, is an additional insured "with respect to liability for 'bodily injury,' 'property damage' or 'personal and advertising injury' caused, in whole or in part, by: 1. Your [SelectBuild's] acts or omissions; or 2. The acts or omissions of those acting on your behalf; in the performance of your ongoing operations for the additional insured(s) . . . ."[13]

---

[7] JPM ¶ 2.

[8] "Commercial General Liability Policy XSLG2373560A," Debtors' Ex. 3.

[9] "Certificate of Insurance SEA-000829662-14," Debtors' Ex. 2.

[10] ACE Policy § I. JPM ¶4.

[11] Endorsement 61 to the ACE Policy. JPM ¶7, ¶8.

[12] ACE Policy § V.12. JPM ¶9.

[13] Endorsement 8 to the ACE Policy. JPM ¶5.

The ACE Policy includes a bankruptcy clause, which states that "[b]ankruptcy or insolvency of the insured or of the insured's estate will not relieve us [ACE] of our obligations under this policy."[14] Additionally, Endorsement No. 61 to the ACE Policy provides,

> In the event you [SelectBuild] are unable to pay the Deductible amount or any portion thereof, our obligation to pay damages to satisfy judgment or pay a settlement shall include the Deductible amount or any portion thereof. However, our obligation to pay damages under this policy shall not exceed the Limits of Insurance as set forth in the policy declarations, and shall not in any event include the 'retained limit' or any portion thereof.

The "General Aggregate Limit" under the "Limits of Insurance" section is $25 million, and the "Each Occurrence Limit" is $1.9 million.[15] The Reorganized Debtors' obligations to ACE are secured by two irrevocable standby letters of credit in the aggregate amount of $30,571,000 (the "Letters of Credit").[16]

*The Accident*

On or about April 3, 2008, three SelectBuild employees (the "Employees") were injured at a Ryland construction site for which SelectBuild was providing subcontractor services under the Contract.[17] The Employees were injured while attempting to manually lift a "balloon wall."[18] The Employees filed workers' compensation claims against SelectBuild and the Employees' medical expenses, lost wages, and damages relating to impairment of earning capacity, totaling over $800,000, have been paid in full by SelectBuild in light of the high deductible on the Debtors' workers compensation policy.[19]

---

[14] ACE Policy § IV.1. JPM, ¶12.
[15] Endorsement 12 to the ACE Policy. JPM ¶6.
[16] JPM ¶ 13.
[17] JPM ¶ 14.
[18] *Id.*
[19] *Id.*

*The Debtors' Bankruptcy Case*

On June 16, 2009, Building Materials Holding Corporation and its affiliates, including SelectBuild, (the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors' cases were jointly administered under Case No. 09-12074. On July 16, 2009, the Court entered an order (Joint D.I. 248)[20] establishing August 31, 2009, as the deadline for filing proofs of claim in the Debtors' cases (the "Claims Bar Date").[21] Ryland received notice of the Claims Bar Date but did not file a proof of claim.[22]

On December 17, 2009, the Court entered an Order (the "Confirmation Order") (Joint D.I. 1182) confirming the Debtors' joint plan of reorganization (the "Plan") (Joint D.I. 1134). Paragraph 17 of the Confirmation Order (and Section 9.1.1 of the Plan) provided for a discharge of the Debtors:

> Except as otherwise expressly provided in the Plan or this Confirmation Order, the Confirmation of the Plan shall, as of the Effective Date: (i) discharge the Debtors, the Reorganized Debtors or any of its or their Assets from all Claims, demands, liabilities, other debts and Interests that arose on or before the Effective Date, including all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a Proof of Claim based on such debt is filed or deemed filed pursuant to section 501 of the Bankruptcy Code, (b) a Claim based on such debt is Allowed pursuant to section 502 of the Bankruptcy Code or (c) the Holder of a Claim based on such debt has accepted the Plan; and (ii) preclude all Persons from asserting against the Debtors, the Reorganized Debtors, or any of its or their Assets, any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, all pursuant to sections 524 and 1141 of the Bankruptcy Code. The discharge provided in this section shall void any judgment obtained against any of the Debtors at any time, to the extent that such judgment relates to a discharged Claim or cancelled Interest."[23]

---

[20] "Joint D.I." refers to the docket in Case No. 09-12074, under which SelectBuild's chapter 11 bankruptcy case was jointly administered with the other Debtors' cases until the cases were closed. SelectBuild's case was reopened in 2013 and recent filings have appeared on the docket in Case No. 09-12085, referred to by the standard "D.I."

[21] A separate deadline was set for certain claims inapplicable to the present matter.

[22] JPM ¶ 16.

[23] Debtors' Ex. 8.

Paragraph 19 of the Confirmation Order also authorized and approved the discharge injunction in

the Plan. Section 9.1.2 of the Plan sets forth the injunction:

> Except as otherwise provided in the Plan or the Confirmation Order, all entities
> that have held, currently hold, or may hold Claims or other debts or liabilities
> against the Debtors, or an Interest or other right of an Equity Security Holder in
> any or all of the Debtors, that are discharged pursuant to the terms of the Plan, are
> permanently enjoined, on and after the Effective Date, from taking any of the
> following actions on account of any such Claims, debts, liabilities or Interests or
> rights: (i) commencing or continuing in any manner any action or other
> proceeding of any kind with respect to any such Claim, debt, liability, Interest, or
> right, other than to enforce any right to Distribution pursuant to the Plan;
> (ii) enforcing, attaching, collecting, or recovering in any manner any judgment,
> award, decree or order against the Debtors, the Reorganized Debtors, or any of its
> or their Assets on account of any such Claim, debt, liability, Interest, or right;
> (iii) creating, perfecting, or enforcing any Lien or encumbrance against the
> Debtors, the Reorganized Debtors, or any of its or their Assets on account of any
> such Claim, debt, liability, Interest or right; (iv) asserting any right of setoff,
> subrogation, or recoupment of any kind against any debt, liability, or obligation
> due to the Debtors, the Reorganized Debtors, or any of its or their Assets on
> account of any such Claim, debt, liability, Interest, or right; and (v) commencing
> or continuing any action, in any manner, in any place that does not comply with
> or is inconsistent with the provisions of the Plan or the Confirmation Order. Such
> injunction shall extend to any successor of the Debtors, the Reorganized Debtors,
> or any of its or their Assets. Any Person injured by any willful violation of such
> injunction shall recover actual damages, including costs and attorneys' fees and
> experts' fees and disbursements, and in appropriate circumstances, may recover
> punitive damages, from the willful violator.[24]

On January 4, 2010, the Plan became effective (the "Effective Date").

In addition to the discharge and discharge injunction, the Plan provided that,

> Prepetition Letters of Credit shall continue to collateralize all obligations under
> Insurance Policies and Agreements . . . secured by such Prepetition Letters of
> Credit, whether such obligations exist as of the Effective Date or arise thereafter,
> and such Prepetition Letters of Credit and obligations shall survive the Effective
> Date unaffected and unaltered by the Plan.[25]

---

[24] *Id.*

[25] Plan § 4.3.2.4. Debtors' Ex. 8.

The bankruptcy cases having been administered, the Court entered a Final Decree Closing Subsidiary Cases and Amending Caption of Remaining Case (Joint D.I. 1896) on June 28, 2011, and a Final Decree Closing the Chapter 11 Case and Granting Related Relief (the "Final Decree") (Joint D.I. 1996) on December 27, 2011. The Final Decree stated,

> [I]t is hereby . . . ORDERED that the Reorganized Debtors are authorized to enter into stipulations granting relief from the Plan discharge injunction, without further order of the Court, provided that (1) such stipulations are in substantially the form of the stipulations previously approved by the Court granting relief from the Plan discharge injunction to permit claimants to pursue insurance proceeds; and (2) such stipulations must include provisions that require either that (a) the claimant ameliorate the financial prejudice to the Reorganized Debtors by the claimant agreeing to pay any deductibles and/or self-insured retention amounts and all allocated loss adjustment expenses that the Reorganized Debtors might otherwise be obligated to pay if the Plan discharge injunction were modified and a claim is asserted by the claimant against any of the Reorganized Debtors' insurance policies; and/or (b) the insurance companies agree to waive any such deductibles and/or self insured retention amounts and allocated loss adjustment expenses . . . .[26]

## The State Court Action

On or about March 16, 2010, the SelectBuild Employees filed a complaint against Ryland in the Circuit Court of Cook County, Illinois, Case No. 10-L-3296 (the "State Court Action").[27] In the State Court Action, the Employees alleged among other things that Ryland "by and through their agents, servants and employees" engaged in "careless and negligent acts and/or omissions" that caused the Employees' injuries on April 3, 2008.[28]

On April 5, 2010, counsel for Ryland sent letters to SelectBuild and ACE to tender Ryland's defense in the State Court Action to SelectBuild, in accordance with the insurance and indemnification language in the Contract.[29] Each letter requested that the recipient accept

---

[26] JPM ¶24.
[27] *Id.* at ¶ 25.
[28] *Id.*
[29] *Id.* at ¶¶ 26-27.

defense of the suit "without reservation and fully indemnify and hold Ryland harmless."[30] On May 20, 2010, counsel for Ryland sent follow-up letters to SelectBuild and ACE, advising that he had not received a response to the prior letters.[31] On June 10, 2010, counsel for Ryland sent an additional follow-up letter to Building Materials Holding Corporation ("BMHC"), SelectBuild's parent entity, again stating that he was "writing on behalf of Ryland to tender the defense of this suit to SelectBuild/BMHC" and asking for notification within fourteen days whether SelectBuild/BMHC would accept defense of the suit.[32] Sometime thereafter, in response to Ryland's letters, SelectBuild retained a law firm to represent Ryland in the State Court Action.[33]

In November 2012, SelectBuild decided to retain new counsel to continue the defense on behalf of Ryland in the State Court Action. Both of the firms that defended Ryland in the State Court Action have been compensated by SelectBuild for services provided, and SelectBuild has committed to continue to provide compensation for defense counsel for Ryland in the State Court Action.[34]

### Ryland's Third-Party Complaint against SelectBuild and Inquiries under the ACE Insurance Policy

On October 5, 2011, Ryland filed a Third-Party Complaint against SelectBuild in the State Court Action, alleging that SelectBuild had engaged in various negligent acts that allegedly caused the SelectBuild Employees' injuries and sought a contribution claim against SelectBuild in an "amount commensurate with SelectBuild Illinois, LLC's assessed percentage of liability for

---

[30] *Id.*
[31] *Id.* at ¶ 28.
[32] *Id.* at ¶ 29.
[33] *Id.* at ¶ 30.
[34] *Id.* at ¶ 40.

Plaintiffs' alleged injuries."[35]    After SelectBuild's bankruptcy counsel notified Ryland that the Third-Party Complaint violated the Plan Injunction, Ryland filed a motion to dismiss the Third-Party Complaint, and the Illinois state court dismissed SelectBuild from the State Court Action without prejudice on December 16, 2011.[36]

In response to an August 2013 inquiry by Ryland as to its rights under the ACE Insurance Policy, ACE advised Ryland that ACE "is pleased to advise you that Ryland qualifies as an additional insured under the ACE policy subject to a reservation of rights."[37]  ACE also stated that "ACE has no duty to provide for the defense of claims or suits" under the ACE Insurance Policy.[38]  In addition, ACE stated that it "reserves the right to deny indemnifying Ryland to the extent the bodily injury was not caused, in whole or in part by the acts or omissions of the named insured or someone acting on behalf of the named insured."[39]

The Joint Pretrial Memorandum states that "Ryland has committed to pay $100,000 towards the resolution of the claims asserted in the State Court Action."[40] "Without conceding that an obligation exists, the payment of this amount will satisfy the Retained limit."[41]

*The Motion to Enforce the Permanent Injunction*

On July 2, 2013, SelectBuild filed a Motion to Reopen Chapter 11 Case for the Limited Purpose of Enforcing the Chapter 11 Discharge and Plan Injunction (D.I. 5). On July 31, 2013, the Court entered an Order Reopening Bankruptcy Case for the Limited Purpose of Enforcing the Chapter 11 Discharge and Plan Injunction (D.I. 12). The Reorganized Debtors filed the Motion

---

[35] *Id.* at 34.
[36] *Id.* at 37.
[37] *Id.* at ¶ 41.
[38] *Id.*
[39] *Id.*
[40] *Id.* at ¶ 44.
[41] *Id.*

on September 27, 2013. Ryland filed its Response and Objection to Reorganized Debtors'
Motion for an Order Enforcing the Permanent Injunction (D.I. 20) on October 18, 2013. The
Reorganized Debtors' reply (D.I. 26) was filed on November 18, 2013, and a hearing was held
on December 12, 2013.

The Reorganized Debtors argue that the confirmed Plan's discharge injunction precludes
Ryland from seeking indemnification as an additional insured under the ACE Policy.  First, the
Reorganized Debtors argue that Ryland's indemnification claim is an attempt to collect a
prepetition claim against the Debtors, for which no proof of claim was timely filed.  Second, the
Reorganized Debtors argue that Ryland's claim against ACE is really a claim against assets of
the Debtors' estate (*i.e.,* the Letters of Credit) because the indemnification action will trigger a
claim by ACE against SelectBuild for the $1.9 million deductible, which is secured by the
Letters of Credit. Finally, the Reorganized Debtors also argue that, because the amount of the
deductible and the limit of insurance "per occurrence" are the same, the Debtors effectively were
self-insured, and Ryland's claim for indemnification against ACE is merely an end-run around
the discharge injunction.

In response, Ryland contends that the discharge injunction does not bar an
indemnification claim against ACE because, as an additional insured under the ACE Policy, it
has independent rights against ACE. Any requirement that Ryland must show SelectBuild's fault
or negligence to succeed on its indemnification claim does not transform the claim into one
against SelectBuild. Ryland also argues that, even assuming the indemnification request can be
considered a claim against SelectBuild, it is a post-petition claim that was not subject to the Plan

discharge because the SelectBuild Employees did not file their complaint in the State Court

Action against Ryland until after SelectBuild filed its bankruptcy petition.[42]

## DISCUSSION

*Jurisdiction*

It is "axiomatic that a court possesses the inherent authority to enforce its own orders." *In

re Cont'l Airlines, Inc.*, 236 B.R. 318, 325-26 (Bankr. D. Del. 1999) (citing *Kokkonen v.

Guardian Life Ins. Co. of America*, 511 U.S. 375, 379–80, 114 S.Ct. 1673, 128 L.Ed. 2d 391

(1994); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991))

*aff'd* 2000 WL 1425751 (D. Del. Sept. 12, 2000), *aff'd* 279 F.3d 226 (3d Cir. 2002); *cert. denied*

123 S.Ct. 345, 154 L.Ed.2d 252 (2002). "In the bankruptcy context, courts have specifically, and

consistently, held that the bankruptcy court retains jurisdiction, *inter alia*, to enforce its

confirmation order." *Cont'l Airlines*, 236 B.R. at 326 (citations omitted). The Confirmation

Order also explicitly retained jurisdiction to enforce its implementation:

> Pursuant to sections 105(a) and 1142 of the Bankruptcy Code, and
> notwithstanding the entry of this Confirmation Order or the occurrence of the
> Effective Date, this Court shall retain jurisdiction over the Chapter 11 Cases and
> all matters arising under, arising in, or related to, the Chapter 11 Cases and the
> Plan to the fullest extent permitted by law, including, among other things,
> jurisdiction over the matters set forth in Article XI of the Plan. This Court shall
> retain jurisdiction to hear and determine all matters arising from the
> implementation of this Confirmation Order.[43]

Indeed, "the court that issued the injunctive order alone possesses the power to enforce

compliance with and punish contempt of that order." *Alderwoods Grp., Inc. v. Garcia*, 682 F.3d

---

[42] Ryland also argues that, in accepting Ryland's tender of defense in the State Court Action, SelectBuild agreed to indemnify Ryland fully.    Because I conclude that Ryland can pursue its indemnification claim against ACE without contravening the Plan's discharge injunction, I need not address this argument.

[43] Confirmation Order ¶ 39.

958, 970 (11th Cir. 2012) (citing *In re Debs,* 158 U.S. 564, 595, 15 S.Ct. 900, 910, 39 L.Ed 1092

(1895) *abrogated on other grounds by Bloom v. Illinois,* 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d

522 (1968); *Waffenschmidt v. MacKay,* 763 F.2d 711, 716 (5th Cir. 1985)); *but see Conseco, Inc.*

*v. Schwartz (In re Conseco, Inc.),* 330 B.R. 673, 680-81 (Bankr. N.D. Ill. 2005) ("A debtor

confronted by a creditor seeking to collect on a debt in possible violation of the discharge

injunction may either 'assert the discharge as an affirmative defense . . . in state court' or 'bring

an Adversary Complaint in bankruptcy court to enforce the statutory injunction under §524(a)(2)

of the Code.'") (quoting *In re Kewanee Boiler Corp.,* 270 B.R. 912, 918 (Bankr. N.D. Ill. 2002)).

> Furthermore, the Third Circuit has determined:

> [T]he jurisdiction of the non-Article III bankruptcy courts is limited after confirmation of a plan. But where there is a close nexus to the bankruptcy plan or proceeding, as when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate.

*Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.),* 372 F.3d 154, 168-69 (3d Cir.

2004). The Motion seeks interpretation and implementation of the discharge injunction of the

confirmed Plan; therefore, the relief sought in the Motion falls within the confines of post-

confirmation related-to jurisdiction.

*The Injunction*

Section 524 of the Bankruptcy Code provides for a discharge injunction: "A discharge in

a case under this title . . . operates as an injunction against the commencement or continuation of

an action, the employment of process, or an act, to collect, recover or offset any such debt as a

personal liability of the debtor . . ." 11 U.S.C. § 524(a)(2). In combination with Sections 9.1.1

and 9.1.2 of the Plan, and paragraphs 17 and 19 of the Confirmation Order (cited above),

Bankruptcy Code § 524 permanently enjoins efforts to collect SelectBuild's discharged debts.

The Reorganized Debtors bear the burden of showing that Ryland's efforts to seek indemnification from ACE violate the permanent injunction. *See Lumb v. Cimenian (In re Lumb)*, 401 B.R. 1, 7 n.6 (1st Cir. B.A.P. 2009).

*When the Claim Arose*

The Reorganized Debtors contend that any indemnification claim by Ryland relating to the State Court Action arose pre-petition because the Contract was signed prepetition and the conduct underlying the indemnification claim occurred in 2008. Ryland argues that (to the extent an indemnification action against ACE is deemed to be a claim against SelectBuild), the claim arose post-petition because the State Court Action was not filed until 2010, which was after SelectBuild filed its bankruptcy petition on June 16, 2009, and after the order confirming the Plan was entered on December 17, 2009.

The Court of Appeals for the Third Circuit considered the issue of when an indemnification claim arises in the *Frenville* case, when it recognized that a contingent right to payment of an indemnification claim under an indemnity agreement exists upon signing of the agreement. *Avellino & Bienes v. M. Frenville Co., Inc. (In re M. Frenville Co., Inc.)*, 744 F.2d 332, 336 (3d Cir. 1984) *overruled by Jeld-Wen, Inc. v. Van Brunt (In re Grossman's Inc.)*, 607 F.3d 114 (3d Cir. 2010) ("When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement.") (internal citations omitted).   The Third Circuit contrasted contractual indemnity claims with common law indemnity or contribution claims, deciding that, although "federal law controls which claims are cognizable under the Code, the threshold question of when a right to payment arises, absent overriding federal law 'is to be determined by reference to state law.'" *Frenville*, 744 F.2d at 337 (quoting *Vanston Bondholders Protective*

*Committee v. Green,* 329 U.S. 156, 161, 67 S.Ct. 237, 239, 91 L.Ed.2d 162 (1946)). The *Frenville* Court then looked to New York law to ascertain when the common law indemnity claim before it arose.

The Third Circuit abandoned *Frenville's* "accrual test" [44] for determining when a claim arises in the later *Grossman's* decision, when the Court, sitting *en banc*, held that a "claim" arises when an individual is exposed pre-petition to a product or other conduct giving rise to an injury, which underlies a "right to payment." *Id.* at 125. The *Grossman's* Court explained that *Frenville's* focus on the "right to payment" failed to give sufficient weight to other words in the statutory definition that modified the term "claim," *i.e.,* "contingent," "unmatured," and "unliquidated." [45] *Grossman's,* 607 F.3d at 121. "The accrual test in *Frenville* does not account for the fact that a "claim" can exist under the Code before a right to payment exists under state law." *Id.*

A Court of Appeals panel revisited the *Grossman's* test in *Wright v. Owens Corning,* 679 F.3d 101 (3d Cir. 2012). The *Wright* Court expanded the test announced in *Grossman's* by holding that "a claim arises when an individual is exposed *pre-confirmation* to a product or other conduct giving rise to an injury that underlies a 'right to payment' under the Code." *Wright,* 679 F.3d at 17 (emphasis in original). To assuage due process concerns, the *Wright* Court also

---

[44] The *Frenville* "accrual test" is often summarized as deciding that "the existence of a valid claim depends on: (1) whether the claimant possessed a right to payment; and (2) when that right arose" as determined by reference to relevant non-bankruptcy law. *Kilbarr Corp. v. Gen. Servs. Admin., Office of Supply & Servs. (In re Remington Rand Corp.),* 836 F.2d 825, 830 (3d Cir. 1988). "State law applies . . . unless federal law 'creates substantive obligations' wholly apart from bankruptcy." *Id.*

[45] The Bankruptcy Code defines the term "claim" in 11 U.S.C. §101(5) as: (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

decided that the *Frenville* test should continue to apply to two groups of claimants: (i) persons who hold claims based upon exposure to a debtor's conduct or product *pre-petition*, if the reorganization plan was proposed and confirmed prior to the date *Grossman's* was decided (June 2, 2010), and (ii) persons who hold claims based upon exposure to a debtor's conduct or product *post-petition*, but *pre-confirmation*, if the reorganization plan was proposed and confirmed prior to the date *Wright* was decided (May 18, 2012). Because the Plan in this case was confirmed on December 17, 2009, the *Frenville* test applies here - - although neither *Grossman's* nor *Wright* really altered the *Frenville* discussion about contractual indemnification claims.

Any claim by Ryland for indemnification based upon the Contract would be a pre-petition, contingent claim, arising when the Contract was signed in 2005. If Ryland had wished to make an indemnification claim directly against SelectBuild, Ryland should have filed a proof of claim by the Claims Bar Date, which it failed to do.

*The Indemnification Request to ACE is not a Claim against SelectBuild*

However, Ryland is not asserting a claim against SelectBuild for indemnification under the Contract.[46] At issue here are Ryland's inquiries about indemnification rights under the ACE Policy. Although the ACE Policy is also a pre-petition contract, Ryland asserts that any claim thereunder is directly against ACE (not SelectBuild), because Ryland qualifies as an additional insured under the Ace Policy.

The Third Circuit has determined that "the protection from liability afforded the debtor under the Code does not affect the liability of the debtor's insurers." *First Fidelity Bank v. McAteer*, 985 F.2d 114, 118 (3d Cir. 1993). A claimant's "failure to file a proof of claim in

---

[46] As noted earlier, the Third-Party Complaint filed against SelectBuild was withdrawn.

reorganization proceedings under Chapter 11 does not bar the claimant from recovering against the debtor's insurers." *Hawxhurst v. Pettibone Corp.*, 40 F.3d 175, 180 (7th Cir. 1994) citing *In re Fernstrom Storage & Van Co.*, 938 F.2d 731, 733 (7th Cir. 1991). Section 524 also specifically states that the discharge injunction does not extend to third parties: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Courts have noted that "a discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt." *In re Schultz*, 251 B.R. 823, 828 (Bankr. E.D. Tex. 2000) quoting *Houston v. Edgeworth (In re Edgeworth)*, 993 F.2d 51, 54 (5th Cir. 1993).

Other courts have determined that a bankruptcy discharge does not preclude a suit brought nominally against the debtor in order to seek relief against the insurer. *Hendrix v. Page (In re Hendrix)*, 986 F.2d 195, 197 (7th Cir. 1993) ("[A]s to whether such an injunction extends to a suit only nominally against the debtor because the only relief sought is against his insurer, the cases are pretty nearly unanimous that it does not.") (citing cases); *see also Hawxhurst,* 40 F.3d at 180; *Schultz,* 251 B.R. at 829. It would appear, then, that the Motion to enforce the discharge injunction should be readily denied since Ryland would be seeking relief against ACE, directly. However, the Reorganized Debtors assert that Ryland's claim against ACE will trigger an obligation to pay the $1.9 million deductible under the ACE Policy, which is secured by the Letters of Credit.[47] Therefore, the Reorganized Debtors urge this Court to examine the reasoning

---

[47] The ACE Policy also includes a self-insured retention ("SIR") in the amount of $100,000. One commentator writes that "[t]he majority rule is that irrespective of state law, the Bankruptcy Code requires an insurer to provide coverage for liability in excess of the deductible or SIR and up to the coverage limits regardless of whether an insolvent insured satisfies amounts owing under the deductible or SIR." Richard L. Epling, Kelly A. Brennan & Brandon Johnson, *Intersections of Bankruptcy Law and*
(continued)

behind those decisions regarding the inapplicability of the discharge, and conclude that the matter at hand is different:

> The reasoning is that a suit to collect merely the insurance proceeds and not the plaintiff's full damages (should they exceed the insurance coverage) would not create a "personal liability of the debtor," because only the insurance company would be asked to pay anything, and hence such a suit would not infringe the discharge.

*Hendrix*, 986 F.2d at 197. *See also Hawxhurst*, 40 F.3d at 181 ("[A] nominal suit, if successful, will not create a personal liability of the debtor and therefore, "will neither deplete the debtor's assets or otherwise interfere with the administration of the bankruptcy proceeding, nor hinder the debtor's fresh start at the close of the proceeding." (quoting *Fernstrom*, 938 F.2d at 734)).

The Reorganized Debtors point out that the "Limits of Insurance" page of the ACE Policy provides that "each occurrence limit" is $1.9 million, which is the same amount as the deductible.  As a result, the Reorganized Debtors argue that the ACE Policy is a "fronting" policy that requires the Reorganized Debtors to reimburse 100% of all sums paid for defense or indemnification of a claim until the primary insuring limits are exhausted."  *See U.S. Gypsum v. Admiral Ins. Co.*, 643 N.E.2d 1226, 1260 (Ill. Ct. App. 1994) (describing a particular excess insurance policy as a "fronting" policy).  Further, the deductible obligations are secured by the Letters of Credit, thereby making the Reorganized Debtors the party actually liable for payment of Ryland's claims under the ACE Policy.

Ryland's status as an additional insured under the ACE Party creates independent contractual rights between Ryland and ACE.  *Overton's, Inc. v. Interstate Fire & Cas. Inc. Co.*

---

*Insurance Coverage Litigation*, 21 J. Bankr. L. & Prac. 2 Art. 1, § III (April 2012) (citing cases).  The article also notes that "[o]ther courts require payment of the SIR as an enforceable condition to coverage distinguishing other decisions as merely applying alternative state law." *Id.* (citing cases).  Because Ryland has agreed to cover the amount of the SIR in this case (*see* JPM, ¶44), I need not decide how the SIR impacts coverage in this case.

*(In re SportsStuff, Inc.)*, 430 B.R. 170, 178 (8ᵗʰ Cir. 2010) (deciding that a bankruptcy court did "not have the jurisdiction or authority to impair or extinguish" the independent contractual rights of additional insureds when it approved a settlement agreement between the debtor and certain insurers).  The ACE Policy provided that ACE was liable for obligations under the policy, regardless of SelectBuild's ability to pay the deductible.  (*See* Endorsement 61).  The ACE Policy also included a bankruptcy clause stating that the insolvency or bankruptcy of SelectBuild did not relieve ACE of its obligations under the ACE Policy.  (ACE Policy, §IV.1.)

The Reorganized Debtors are trying to fuse Ryland's claim against ACE, and ACE's claim against them, into one direct claim by Ryland against the Reorganized Debtors.  However, these obligations are separate. That the Reorganized Debtors may ultimately be responsible for the claim, or that ACE may draw against the Letters of Credit to satisfy its claim against the Reorganized Debtors, does not change this.  ACE's liability to Ryland is not dependent upon whether there exists a source of payment from the Reorganized Debtors, but upon Ryland's direct rights as an additional insured under the Policy.[48]

*D&O Cases*

In further support of their position that the ACE Policy proceeds constitute property of the estate, the Reorganized Debtors rely upon cases involving director and officer ("D&O") liability insurance. In *Downey Financial*, the court explained:

> When a debtor's liability insurance policy only provides direct coverage to the debtor, courts generally hold that the proceeds are property of the estate. Conversely, when the liability insurance policy only provides direct coverage to the directors and officers, courts generally hold that the proceeds are not property of the estate. When the liability insurance policy provides direct coverage to both the debtor *and* the directors and officers, "the proceeds will be property of the

---

[48] Although I conclude that Ryland may assert an independent claim as an additional insured against ACE, nothing in this decision determines the extent of coverage or other rights available to Ryland as an additional insured under the ACE Policy.

estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution."

*In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del. 2010) (footnotes and citations omitted). *See also In re Allied Digital Tech. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004).

The Reorganized Debtors' analogy to the D&O cases is not persuasive. The D&O cases concern "wasting" insurance policies in which both a debtor and its D&Os seek payment of the insurance proceeds. Here, the Reorganized Debtors have not alleged that Ryland's claim to the insurance proceeds for indemnification impairs the Reorganized Debtors' ability to obtain proceeds for its own claims. Instead, they argue that the payment of Ryland's claims under the ACE Policy will trigger the Reorganized Debtors' deductible obligations which, in turn, if not paid directly by the Reorganized Debtors, will deplete the Letters of Credit and harm the estate. However, as discussed above, the continued collateralization of the deductible obligations was a specific commitment made through the confirmed Plan, which provided:

> Notwithstanding anything in the Plan to the contrary (including, without limitation, any other provision that purports to be preemptory or supervening or grants an injunction or release), Insurance Policies and Agreements are treated as Executory Contracts under the Plan; and all references to Executory Contracts shall include the Insurance Policies and Agreements. On the Effective Date, the applicable Debtors that are parties to such Insurance Policies and Agreements and the applicable Reorganized Debtors shall be deemed to have assumed in accordance with section 365 of the Bankruptcy Code all such Insurance Policies and Agreements, and the applicable Reorganized Debtors shall remain liable for all obligations under the Insurance Policies and Agreements, whether now existing or hereafter arising, and shall pay such obligations in the ordinary course of business. The applicable insurers shall be deemed to have consented to such assumption. Nothing in the Plan: (a) precludes or limits the rights of insurers to contest or litigate with any party, (b) permits any holder of an Insured Claim to recover the same amounts from an insurer and any other party including, but not limited to, the Debtors (or after the Effective Date, the Reorganized Debtors); (c) alters an insurer's rights and obligations under its Insurance Policies and Agreements or modifies the coverage provided thereunder; (d) alters the rights and obligations of the Debtors (or after the Effective Date, the Reorganized Debtors) or the insurers under the Insurance Policies and Agreements, including, without limitation, any duty of the Debtors' to defend, at their own expense,

against claims asserted under the Insurance Policies and Agreements; (e) discharges, releases or relieves the Debtors or Reorganized Debtors, after the Effective Date, from any debt or other liability under the Insurance Policies and Agreements; or (f) limits, diminishes, or otherwise alters or impairs the Debtors', Reorganized Debtors' and/or an insurer's defenses, claims, Causes of Action or other rights under applicable non-bankruptcy law with respect to the Insurance Policies and Agreements. If an insurer objects to the proposed assumption of its Insurance Policies and Agreements, or any of them, or the proposed Cure Claim related thereto, the insurer must comply with the objection procedure specified in section 6.4 of the Plan and the Disclosure Statement Approval Order.

Plan, §7.17.[49] The Reorganized Debtors agreed expressly to preserve "all obligations under the Insurance Policies and Agreements, whether now existing or hereafter arising" and to keep the collateral in place to secure those claims.    ACE's rights vis-a-vis SelectBuild and the Reorganized Debtors do not bar Ryland's rights to assert an independent claim as an additional insured against ACE.

*The Weis and Centex Motions*

To further support its position, the Reorganized Debtors also cite two previous orders entered by this Court in these jointly administered cases, regarding: (i) motions by Weis Builders, Inc. ("Weis Builders") for orders enlarging the Claims Bar Date (Joint D.I. 817) and for modification of the automatic stay (Joint D.I. 597) (the "Weis Motions"), and (ii) motions by Centex Homes, *et al.* ("Centex"), for orders enlarging the Claims Bar Date and seeking relief from the discharge injunction (the "Centex Motions").   SelectBuild points out that the Court's orders resolving those motions conditioned any relief upon the claimants' agreements to satisfy

---

[49] The Plan defines the term "Insurance Policies and Agreements" as "all of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto including, without limitation, all payment and collateral agreements. The Plan defines "Insured claim" as "a Claim covered by one or more of the Debtors' Insurance Policies and Agreements, including, but not limited to, tort claims, property damage claims, personal injury claims, general liability claims, automobile liability claims and employer liability and workers' compensation claims within or above the applicable deductible or self-insured retention under the applicable policy." The Plan defines "Claim" as having "the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor or any Estate whether or not asserted." Plan Appendix A, ¶¶ 84, 85 and 30.

any deductible or SIR that the Debtors (or the Reorganized Debtors) might be obligated to pay as a result of the claimants' pursuit of litigation against the Debtors and its insurance companies.[50] The Reorganized Debtors argue that any relief to Ryland likewise must be conditioned upon an agreement to satisfy any deductible or SIR. Neither of these matters informs the outcome of the dispute now before me.

Unlike the matter before me now, the Weis Motions and the Centex Motions requesting relief from the discharge injunction were both inextricably tied to requests to enlarge the bar date to accommodate the filing of late claims against the Debtors by the movants. Although both movants claimed status as additional insureds under applicable policies, the outcome of neither prior matter turned on that circumstance. Moreover, there may be additional distinguishing factors in the Weis and Centex matters that a comparison of the insurance policies at issue could reveal.[51]   Here, Ryland has not filed, and does not seek to file, a claim against the Debtors. Ryland seeks only to pursue its rights as an additional insured directly against ACE. Although I understand that, ultimately, the burden to pay Ryland's claim may fall upon the Reorganized Debtors, it is an obligation for which the Reorganized Debtors specifically agreed to remain responsible under the terms of the confirmed Plan.

---

[50] A Combined Order noted, with approval, that granting the Weis Motions was conditioned upon Weis' offer to satisfy any deductible or SIR. (Joint D.I. 1592.) The Centex Motions were denied without prejudice to Centex's ability to obtain relief if Centex agreed to pay any deductible or SIR. (Joint D.I. 1987.)

[51] The Weis Order states that the "ruling is limited to the particular facts and circumstances relating to Weis." Weis Order ¶ L.

CONCLUSION

For the reasons set forth above, I conclude that the Reorganized Debtors' Motion should

be DENIED.  An appropriate Order follows.


BY THE COURT:


KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated:  May 28, 2015